IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOEL BROWN COAKLEY,

      Plaintiff,

                                     Civil Action 2:13-cv-84
    v.                           Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## OPINION AND ORDER

Plaintiff, Joel Coakely, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 9), and the administrative record (ECF No. 7). For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.

## I.      BACKGROUND

This matter involves Plaintiff's second application for disability benefits. Plaintiff initially filed for disability insurance benefits and supplemental security income on June 9, 2005, alleging that he became disabled on December 6, 2004, at age 46. (R. at 107.) After Plaintiff's initial application and request for reconsideration were denied, he requested a *de novo* hearing before an administrative law judge. *Id.* An evidentiary hearing was held by Administrative Law Judge Joel G. Fina ("ALJ Fina"), who then denied Plaintiff's applications on June 11, 2008 ("the

first determination"). (R. at 104–18.) The Appeals Council denied review in April 2009. (R. at 123–27.) Plaintiff did not appeal the first determination.

Plaintiff filed new applications for both disability insurance benefits and supplemental security income in July 2008, alleging that he became disabled on June 12, 2008, the day after ALJ Fina issued the first determination. (R. at 156–64, 165–68.) Plaintiff alleged disability as a result of degenerative joint disease, chronic joint pain, anxiety, fibromyalgia, high blood pressure, irritable bladder, depression, acid reflux, osteoarthritis, mood swings, arthritis in both knees, bunions, heel spurs, and arthritis. (R. at 239.) After Plaintiff's second application was denied initially and upon reconsideration, he requested a *de novo* hearing before an administrative law judge. Administrative Law Judge Rita S. Eppler ("ALJ Eppler") held a hearing on May 19, 2011. Plaintiff, represented by counsel, appeared and testified. (R. at 44–65.) Lynn M. Kaufman, a vocational expert, also appeared and testified. (R. at 65–73.) On July 12, 2011, ALJ Eppler issued a partially favorable determination. (R. at 23–31.) She found that Plaintiff became disabled on April 1, 2010, but that he was not disabled prior to that date. (*Id.*) On November 30, 2012, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–5.) Plaintiff timely commenced this action.

## II.   HEARING TESTIMONY

Plaintiff testified that he lives alone in a trailer. (R. at 45.) Plaintiff stated that he holds a driver's license and drives short distances once a week to get groceries and to doctor appointments "once in a while." (R. at 45.) He added that, sometimes, he drives to get groceries only twice a month. (R. at 57.) Plaintiff's adult son drove him to the hearing. (R. at 45.)

Plaintiff further testified that he was prescribed a cane by his doctor, Dr. Neff, in November 2010 to keep pressure off his knees and to keep him from falling down.  (R. at 48–49.)  Plaintiff uses the cane when he leaves his house but is able to hold onto things to prevent falling when he is at home.  (R. at 64).  He also testified that problems with his back, knees, and right wrist were his most significant problems.  (R. at 49.)  He estimated that problems with his back began in 2004 or 2005, problems with his knees began two or three years before the hearing, and problems with his right wrist began a year or two before the hearing.  (R. at 49, 52.)  He also described suffering from fibromyalgia pain in all of his joints and the muscles around his joints.  (R. at 60.)  The fibromyalgia causes him irritable bladder, difficulty concentrating, "pins and needles" in his arms, and sensitivity to noise and light.  (R. at 59, 60.)  Plaintiff also explained that bradycardia makes him tired.  (R. at 63.)

Plaintiff testified that to deal with his problems, he receives pain management therapy and counseling.  (R. at 49.)  He stated that he takes medicines that are prescribed to him in the manner prescribed, including Bystolic for blood pressure, Claritan and Loratadine for allergies, ibuprofen, and valium.  (R. at 50.)  He also testified that valium makes his memory worse and that other pills cause him to experience increased urination, fatigue, and dry mouth.  (R. at 50, 58.)  Plaintiff indicated that his doctors have discussed surgery for his back and knee problems, including possibly fusing disks in his spine, and eventually a left knee replacement.  (R. at 63–64.)  In the meantime, doctors have discussed possibly giving Plaintiff epidural shots for his back.  (R. at 63.)  Plaintiff currently receives Synvisc and cortisone shots for his left knee.  (R. at 64.)

Plaintiff estimated that he can sit in a straight chair for approximately thirty minutes before he needs to get up and move around.  (R. at 50–51.)  He testified that he does not believe

that he could sit in a chair for a typical eight-hour day.  (R. at 51.)  He estimated that he can stand for ten to fifteen minutes.  (R. at 52.)  Plaintiff represented that walking and moving around causes increased pain and swelling in his knees and that he could not lift more than a gallon of milk.  (R. at 52, 61.)

In terms of daily activities, Plaintiff testified that he takes a shower and eats breakfast in the morning.  (R. at 56.)  He then spends most of his day seated in a recliner with his feet elevated to relieve the swelling in his knees and pressure in his back.  (R. at 56–57.)  He further testified that he constantly experiences pain.  (R. at 56.)  He testified that he cannot push a sweeper because of pain in his right wrist and described experiencing pain when manipulating zippers, buttons, combing his hair, and brushing his teeth.  (R. at 52–53.)  Plaintiff's daughter-in-law does his sweeping, cleaning, and cooking.  (R. at 57.)  From time to time, however, Plaintiff heats up a "TV dinner" and "once in a great while" puts a small load of laundry in the washer.  (*Id.*)  He represented that he does not belong to any social clubs and has no hobbies. (R. at 58.)

Plaintiff also testified regarding his emotional and mental health issues.  He stated that he has regularly and consistently received mental health counseling at Tri-County Mental Health since 2006.  (R. at 56.)  He has never been hospitialized for any mental health issues.  (*Id.*)  He stated that he suffers from daily depression and described sadness, mood swings, crying, not wanting to do anything, and not wanting to socialize.  (R. at 61–62.)  He also testified that he experiences anxiety attacks approximately once a week and that he finds it difficult to talk in front of other people.  (R. at 53, 62.)  He explained that his anxiety attacks could be triggered by being around groups of people, like in a store, or driving in heavy traffic.  (R. at 62–63.)  Plaintiff described problems with primarily his short-term memory and concentration.  (R. at

65.) He testified that he had experienced memory and concentration problems for as long as he could remember. (*Id.*)

### III. MEDICAL RECORDS[1]

**A. Physical Impairments**

**1. Treating Physician, Robert J. Neff, M.D.**

On June 30, 2008, Plaintiff's primary care physician, Dr. Robert J. Neff, identified Plaintiff's diagnoses as fibromyalgia, joint pain in both knees, and cervical osteoarthritis. (R. at 389.) Dr. Neff noted a palpable click and pop in Plaintiff's knees that was worse in his left knee. (*Id.*) Dr. Neff further noted that Plaintiff was upset that his disability claim had been denied. (*Id.*) Dr. Neff prescribed Naprosyn and Darvocet. (*Id.*) On July 30, 2008, Plaintiff reported that he could not tolerate the side-effects from the Naprosyn and complained about "all joints aching bad," and "burning pain up [his] back." (R. at 303.) He also told Dr. Neff that he felt forgetful and "really depressed – worse than ever since his [was] disability denied." (*Id.*) Plaintiff also reported feeling stressed because his counselor was leaving for another position. (*Id.*) Dr. Neff noted that Plaintiff generally appeared to be "his usual self" and that he looked and acted well. (*Id.*) He also noted that Plaintiff was going to church, praying a lot, wearing orthotics in his shoes, and that Plaintiff believed he was "doing better." (*Id.*) Dr. Neff diagnosed Plaintiff with fibromyalgia exacerbation, joint pain, chronic pain syndrome, and depression. (*Id.*) X-rays of both knees taken that day showed mild to moderate degenerative arthritis involving both knees. (R. at 284.) The X-rays also revealed narrowing of the joint spaces medially due to degeneration

---

[1]The administrative record contains additional medical evidence from 2011 and 2012. (R. at 661–748). That evidence was not before the ALJ. Rather, Plaintiff submitted it to the Appeals Council. Because the Appeals Council denied Plaintiff's request for review, that evidence is not a part of the record for purposes of substantial evidence review of the ALJ's decision. *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted). Consequently, the Court considers only the evidence that was before the ALJ.

associated with subchondral sclerosis and small spurs about the patella on each side. (*Id.*) The X-ray of Plaintiff's left knee revealed a "fairly prominent exostosis involving the distal left femur." (*Id.*) Handwritten notes on Dr. Neff's final report from that visit indicate that Plaintiff was referred to Dr. Kauffman for possible synvisc injections. (*Id.*) Nurses' notes dated August 4, 2008, indicate that Plaintiff declined Dr. Neff's referral. (R. at 331.)

On August 29, 2008, Dr. Neff noted that Plaintiff had seen Dr. Kauffman about his knee problems. (R. at 304.) Plaintiff also reported that he was wearing arch supports in his shoes and that those "really help when [he was] up and around, but [that] the inside of [his] feet burn when he takes [his] shoes off." (*Id.*) Plaintiff described pain that radiated from the lateral side of his hip to the lateral side of his foot. (*Id.*) He further reported experiencing anxiety, worsening depression, and having no reason to do anything. (*Id.*) Dr. Neff noted that Plaintiff appeared to be his "usual self" and diagnosed Plaintiff with bradycardia, fibromyalgia, and bilateral osteoarthritis of the knees. (*Id.*)

On September 29, 2008, Plaintiff told Dr. Neff that he was feeling anxious and was experiencing increased pain in his neck and back. (R. at 469.) Plaintiff added that his knee was "feeling better" following a steroid injection. (R. at 469.) Dr. Neff noted that Plaintiff appeared to be his "usual self" but that he was moving slowly and had "no evident knee effusion or warmth. . . and mild patellar crepitus" of the left knee. (*Id.*) On October 28, 2008, Plaintiff told Dr. Neff that his back and knees hurt intensely, that he had received two injections in his left knee from Dr. Kauffman, and that he was experiencing deep pressure in his left knee. (R. at 468.) Plaintiff also told Dr. Neff he was regularly attending physical therapy. (*Id.*) Dr. Neff noted no evident swelling but noted patellar crepitus in both knees. (*Id.*) During that visit, Dr.

Neff noted again that Plaintiff appeared to be his usual self and diagnosed Plaintiff with osteoarthritis of the shoulders, knees, and lower spine and chronic pain. (R. at 468.)

In November 2008, Dr. Neff noted that Plaintiff was moving slowly. (R. at 467.) He also noted that Plaintiff was experiencing fatigue, fibromyalgia pain, and arthritis pain exacerbated by cold weather. (R. at 467.) Plaintiff told Dr. Neff that he was unable to walk outside because his knee pain was intolerable and that he had experienced episodes with his bradycardia. (*Id.*) Plaintiff also told Dr. Neff that he was worried about his family getting together for Thanksgiving. (*Id.*) Dr. Neff recorded finding "generalized muscle tenderness" and "mild crepitus of the knees, no effusion." (*Id.*)

On December 23, 2008, Dr. Neff reported that Plaintiff appeared to be his "usual self" and was in "no evident distress." (R. at 466.) During that visit, Plaintiff reported getting an injection for his knee and that the cold weather exacerbated his joint pain. (*Id.*) He also reported that he felt discouraged because his social security claim had been denied. (R. at 466.) On January 26, 2009, Dr. Neff again noted that Plaintiff appeared to be his usual self. (R. at 465.) During that visit, Plaintiff told Dr. Neff that he had received all injections for his knees and again reported that the cold weather exacerbated his knee pain. (*Id.*)

On May 27, 2009, Dr. Neff filled out a "Multiple Impairment Questionnaire" in which he reported that he began treating treated Plaintiff in 2002. (R. at 496.) He listed Plaintiff's diagnoses as fibromyalgia, hypertension, GERD, bilateral knee osteoarthritis, plantar fasciitis, irritable bowel syndrome, mild degenerative disc disease of the entire spine that was the worst at T4-5, right rotator cuff injury, sternoclavicular arthritis, generalized anxiety disorder, and chronic depression. (*Id.*) Dr. Neff's clinical findings included tender points in the major muscle points in major muscle groups corresponding to the American Rheumatology Association criteria

for fibromyalgia and mild palpable crepitus below the patella with range of motion in both knees. (*Id.*)  Diagnostic evidence included x-rays showing mild to moderate osteoarthritis of both knees and lab blood testing.  (R. at 496–97.)  Plaintiff's primary symptoms included generalized muscle and joint pain with soreness and stiffness exacerbated with activity, easy fatigability, and impaired memory and recall.  (R. at 497.)  Dr. Neff noted that Plaintiff's pain was continuous and exacerbated by increased activity.  (R. at 498.)  Dr. Neff estimated that Plaintiff's pain ranged from a 4-10 on a 10-point scale, and that his fatigue ranged from a 4-6 on a 10-point scale.  (*Id.*)  Dr. Neff stated that: "[m]ost of the patients I follow and treat for fibromyalgia are able to function and work full-time. [Plaintiff's] pain is disabling." (R. at 497.)

In the questionnaire, Dr. Neff additionally opined that Plaintiff was able to sit 8 for hours, but would need to get up, move around, and take frequent ten-minute breaks every half hour or take half-hour breaks four or five times a day.  (R. at 498–99, 502.)  He found that Plaintiff would be able to stand/walk 2 hours in an 8-hour workday.  (R. at 498.)  Dr. Neff opined that Plaintiff could occasionally lift and carry up to 20 pounds, but could never lift anything heavier. (R. at 499.)  Dr. Neff also found that Plaintiff had significant limitations doing repetitive reaching, handling, fingering, and lifting due to stiffness and pain in his fingers.  (*Id.*)  He opined that Plaintiff had moderate limitations using his upper extremities for grasping, turning, and twisting objects, performing fine manipulations, and reaching.  (R. at 499, 501.)  Plaintiff's medications caused dyspepsia, sedation, lethargy, tremor, diarrhea, headaches, irritability, shakiness, nausea, bloating, swelling, a bitter taste in the mouth, constipation, increased appetite, weight gain, bradycardia, and exacerbated memory issues and hypertension.  (R. at 500–01.)  Dr. Neff noted that Plaintiff did not tolerate physical therapy well because it increased his pain, but that corticosteroid injections were helpful for Plaintiff's knee pain.  (R. at 501.)  Dr. Neff opined

that Plaintiff's symptoms would be aggravated if he was placed in a competitive work environment or forced to keep his neck in a constant position such as looking at a computer screen. (R. at 502.) Dr. Neff agreed that Plaintiff's pain, fatigue, or other symptoms frequently interfered with his attention and concentration and that his chronic anxiety and depressed mood contributed to the severity of his symptoms. (R. at 502.) Dr. Neff estimated that Plaintiff would be absent from work, on average, more than three times a month and that he would need to avoid the following at work: wetness, noise, fumes, gases, extreme temperatures, humidity, dust, heights, kneeling, bending, and stooping. (R. at 503.) Plaintiff's ability to push or pull would also be limited. (*Id.*) Dr. Neff noted that in his "best medical opinion," the earliest date that these symptoms and limitations applied was 1993, except that Plaintiff's anxiety symptoms were present much earlier, as Plaintiff reported having anxiety symptoms all of his life. (R. at 503.)

On July 20, 2009, Dr. Neff wrote that Plaintiff appeared "slow" and "stiff getting up from [a] chair." (R. at 552.) Plaintiff told Dr. Neff that he developed knee pain after standing for more than an hour. (R. at 552.) Plaintiff also reported that Dr. Kauffman was giving him Hyalgan injections in both knees and that these injections helped more than the cortisone injections. (R. at 552.) On August 19, 2009, Dr. Neff recorded that Plaintiff's knees had slightly elevated warmth, swelling, and redness and further noted mild patellar crepitus. (R. at 551.) Plaintiff reported that his knees were "50% better now." (R. at 551.) Dr. Neff noted that Plaintiff appeared cheerful. (*Id.*) Plaintiff told Dr. Neff that his depression was a little better lately and that he enjoyed playing with his grandson. (*Id.*) Dr. Neff also wrote that Plaintiff's remote history of neck pain had resolved with treatment. (*Id.*)

On January 27, 2010, Dr. Neff recorded that Plaintiff appeared pleasant and told Dr. Neff that he was "hanging in there." (R. at 609.) Plaintiff also told Dr. Neff that three or four times a

week, his pain intensity was up to an eight on a ten-point scale after increased activity or sitting too long.  (*Id.*)  He also indicated that Dr. Kauffman had been giving him Synvisic injections and that those "help[ed] some."  (*Id.*)  Plaintiff reported that Dr. Kauffman was also going to be giving him ortho gel.  (*Id.*)  Plaintiff reported to Dr. Neff that his walking was limited by his knee and back pain, that he got a lot of headaches, and that he was experiencing low-grade neck pain.  (*Id.*)

On April 26, 2010, Dr. Neff treated Plaintiff and completed another Multiple Impairment Questionnaire.  (R. at 595–602, 607.)  Dr. Neff recorded that Plaintiff continued to deal with chronic pain in his back, knees, ankles, and other joints.  (R. at 607.)  He also noted that Plaintiff appeared to be his usual self and that he moved slowly as if stiff.  (*Id.*)  In the questionnaire, he listed his diagnoses as: bilateral knee and cervical spine osteoarthritis, multi-level degenerative disc disease of the spine, fibromyalgia, irritable bowel syndrome, plantar fasciitis, osteochondroma of the left knee, generalized anxiety, social anxiety disorder, and chronic depression.  (R. at 595.)  Dr. Neff also suspected that Plaintiff had a personality disorder.  (*Id.*)  Dr. Neff noted that Plaintiff experienced pain in both knees but with more pain on the left side, stiffness, and crepitus with movement.  (*Id.*)  Dr. Neff recorded significant tenderness to palpation in Plaintiff's planter arches and anterior calcaneus in both feet and tenderness to palpitation in his lower cervical spine, which had a mildly restricted range of motion.  (R. at 595–96.)  Dr. Neff also observed tender points in Plaintiff's major muscle groups that corresponded to the American Rheumatology Association's criteria for fibromyalgia.  (R. at 595.)  X-ray evidence revealed mild to moderate osteoarthritis in Plaintiff's knees and osteochondroma in his left knee, degenerative disk disease in his entire spine, and cervical stenosis.  (R. at 595–96.)  Dr. Neff listed Plaintiff's primary symptoms as generalized muscle

aching; soreness and joint pain exacerbated by cold, increased activity, and inadequate sleep; easy fatigability; and chronic anxiety exacerbated by social events and depression.  (R. at 596.) Dr. Neff estimated that Plaintiff's pain ranged from a 6-8 on a 10-point scale at that his fatigue ranged from a 6-7 on a 10-point scale.  (*Id.* at 597.)  Dr. Neff again stated that "most of the patients I see and treat from fibromyalgia, osteoarthritis, degenerative disk disease, and anxiety/depression respond to treatment well enough to fulfill their responsibilities and work full or part-time. [Plaintiff's] pain is disabling."  (R. at 596.)

In this questionnaire, Dr. Neff opined that Plaintiff was able to sit for 8 hours, but would need frequent breaks every half hour or hour to stand, stretch, or move around and would need one to two hours before resuming sitting.  (R. at 597.)  Plaintiff would be able to stand/walk for 2 hours in an 8-hour workday.  (R. at 498.)  Dr. Neff opined that Plaintiff could frequently lift up to five pounds, occasionally lift and carry up to 20 pounds, but could never lift or carry anything heavier.  (R. at 499.)  Dr. Neff reported that Plaintiff had moderate limitations using his upper extremities for grasping, turning, and twisting objects and minimal limitations performing fine manipulations and reaching.  (R. at 598–99.)  Plaintiff's medications caused dyspepsia, heartburn, sedation, lethargy, tremor, diarrhea, headaches, irritability, shakiness, nausea, bloating, swelling, and upset stomach.  (*Id.*)  Dr. Neff noted that Plaintiff did not tolerate physical therapy well because it increased his pain, and that corticosteroid and ortho-visc knee injections were helpful but temporary. (R. at 599.)  Dr. Neff opined Plaintiff's symptoms would be aggravated if Plaintiff was placed in a competitive work environment or forced to keep his neck in a constant position such as looking at a computer screen.  (R. at 599–600.)  Dr. Neff agreed that Plaintiff's fatigue or other symptoms periodically interfered with his attention and concentration and that his depressed mood and social anxiety disorder contributed to the severity

of his symptoms. (R. at 600.) Dr. Neff opined that Plaintiff's anxiety, depression, fibromyalgia, and hypertension made him capable of tolerating only low-stress work. (*Id.*) Dr. Neff estimated that Plaintiff would be absent from work, on average, about two to three times a month and that his psychological limitations would affect his work ability. (*Id.*) He would also need to avoid heights and kneeling and had limited tolerance for pushing, pulling, bending, and stooping. (R. at 601.) Dr. Neff noted that in his "best medical opinion," the earliest date that these symptoms and limitations applied was 1993, except that Plaintiff's anxiety symptoms were present much earlier. (R. at 601.) Dr. Neff further noted that Plaintiff had been to counseling for several years with Dr. Resch, a psychiatrist at Tri-County Mental Health ("Tri-County"). (*Id.*)

On May 28, 2010, Dr. Neff noted that Plaintiff appeared to be his usual. (R. at 606.) Dr. Neff further noted that Plaintiff was still in a lot of pain in his joints and that his lumbosacral spine and was experiencing memory and recall issues. (*Id.*) Plaintiff reported that his children were doing the household chores and that he limited his activities to 10 to 15 minutes because his pain flared. (*Id.*) Examination showed decreased lumbar spine motion and knee swelling. (*Id.*) In July 2010, Plaintiff similarly reported that his joints and were hurting more lately, he had reduced his activities over the last year to avoid provoking pain, and his children were doing his housecleaning and yard work. (R. at 605.) Dr. Neff noted that Plaintiff told him that he used to watch television, do word search puzzles, read the bible, and occasionally walked to his son's home to watch his grandson. (*Id.*)

On September 28, 2010, Plaintiff again told Dr. Neff that his pain was greater worse in cold weather and that the muscles in his back hurt more unless he took valium. (R. at 604.) Plaintiff was also receiving repeat Synvisic injections in his knee. (*Id.*) Dr. Neff found no evidence of swelling. (*Id.*) Plaintiff related that his Father's recent death "really shook him up."

(*Id.*)  On November 16, 2010, Plaintiff told Dr. Neff that his back, neck, and hips really hurt that week.  (R. at 628.)

Dr. Neff completed a narrative statement regarding Plaintiff's impairments on February 21, 2011.  After reiterating his previous findings, Dr. Neff concluded, "[m]y previously completed Multiple Impairment Questionnaires dated May 27, 2009 and April 26, 2010 remain a valid and accurate representation of my opinion."  (R. at 635–36.)

### 2. Treating Physician, Matthew J. Kauffman, D.O., and Treating Physician Assistant, Scott Cryder, PA-C

Orthopedic surgeon Dr. Kauffman first saw Plaintiff about his left knee on August 26, 2008.  (R. at 453–54.)  At that time, Plaintiff reported a sixteen-year history of progressively worsening knee pain and intermittent pain in his back since the 1970s that had worsened in recent months.  (*Id.*)  He also complained of pain when going up or down stairs or when sitting with his knee bent for long periods of time.  (*Id.*)  Plaintiff noted some swelling in his knee and occasional popping and cracking, but denied specific locking, catching, or giving out.  (R. at 453.)  Upon examination, Dr. Kauffman noted minimal tenderness of the lumbar spine, minimal tenderness to palpation of the paraspinal muscles, boggy effusion of the left knee, limited range of motion in the left knee, pain with palpation over the medial and lateral compartments of the left knee, and crepitus.  (R. at 454.)  Dr. Kauffman further noted that X-rays showed some moderate degenerative osteoarthritis with an osteophyte.  (*Id.*)  Dr. Kauffman diagnosed osteoarthritis of the left knee with exostosis and possible osteochondroma. (*Id.*)

On September 3, 2008, an MRI of Plaintiff's left knee showed a somewhat truncated appearance to all portions of the medial meniscus that the radiologists noted might be degenerative in nature; no displaced meniscal materal; no other internal derangements within the tiblofemoral or patellofemoral joints; and distal lateral femoral metaphysical osteochondroma

with a thin cartilage cap. (R. at 381–82.) Based on these MRI results, which confirmed degenerative osteoarthritis in the left knee, Dr. Kauffman injected Plaintiff's left knee with cortisone on September 9, 2008, and referred Plaintiff to physical therapy. (R. at 455.)

On October 21, 2008, Dr. Kaufmann reported that Plaintiff told him he was feeling a bit better, but that he experienced pain when standing for long periods. (R. at 456.) Plaintiff told Dr. Kaufmann that he was doing his home exercises and that he was about 50% better. (*Id.*) Dr. Kauffman's examination revealed stable knee motion with mild effusion about Plaintiff's knee and tenderness along the medal joint line. (*Id.*) Dr. Kauffman administered another cortizone injection and recommended Plaintiff receive a course of Visco injections. (*Id.*)

Plaintiff received Synvisc injections in his left knee on December 23, 2008, December 30, 2008, and January 7, 2009. (R. at 458–60.) Physician's Assistant Scott Cryder's notes reflect that Plaintiff experienced minimal improvement after the first injection, but showed decent improvement after the second injection. (R. at 459–60.) By January 22, 2009, Plaintiff stated that the Synvisc injections had given him 60% relief. (R. at 461.) Plaintiff also told Dr. Kauffman that he got stiff with prolonged standing. (*Id.*) Dr. Kauffman opined that Plaintiff was "showing progressive improvement" and recommended that he continue his home exercise program and take ibuprofen and Darvoset as needed. (*Id.*)

Three months later, Dr. Kauffman noted that Plaintiff had increased pain with increased activity but was otherwise doing about the same. (R. at 540.) During that April 23, 2009 visit, Dr. Kauffman's physical examination revealed no changes except increased pain over Plaintiff's joint line. (*Id.*) Because of the increased pain, Dr. Kauffman gave Plaintiff a cortisone injection and switched him from Darvocet to Vicodin. (*Id.*) Dr. Kauffman gave Plaintiff another cortisone injection on May 14, 2009, because the injection in April had provided some relief. (R.

at 539.)  During that May visit, Plaintiff reported continued soreness in his left knee.  (*Id.*)  He also told Dr. Kauffman that he was doing his home exercises and that even though Celebrex provided him relief, he had switched to Mobic because Celebrex was not covered by his insurance.  (*Id.*)  Dr. Kauffman determined that Plaintiff might benefit from Hyalgan injections. (*Id.*)

Dr. Kauffman completed a Lower Extremities Impairment Questionnaire on June 16, 2009.  Dr. Kauffman diagnosed Plaintiff with osteoarthritis and osteochondroma in his left knee. (R. at 522.)  Dr. Kauffman noted that Plaintiff's prognosis was fair.  (*Id.*)  His clinical findings included limited range of motion in Plaintiff's left knee, tenderness of the medial joint line in the left knee, and an abnormal gait.  (R. at 522–23.)  Dr. Kauffman wrote that Plaintiff's primary symptoms were left knee soreness, stiffness, mild joint line tenderness, and increased pain with stair climbing or prolonged bending of the knee.  (R. at 524.)  Walking, standing, climbing, kneeling, squatting or crawling also increased Plaintiff's pain.  (*Id.*)  Dr. Kauffman stated that that Plaintiff could effectively initiate and sustain ambulation and complete tasks but that pain could interfere with his ambulation.  (R. at 524–25.)  Dr. Kauffman also wrote that Plaintiff was able to carry out activities of daily living without assistance, including traveling, preparing meals, and bathing.  (R. at 525.)

Dr. Kauffman further opined that Plaintiff could stand or walk 2 hours total in an 8-hour workday and sit 5 hours total in an 8-hour workday, but needed to get up and move around for fifteen minutes every half hour.  (R. at 525, 527–28.)  He estimated that Plaintiff could occasionally lift up to ten pounds, but could never lift more.  (R. at 526.)  He opined that Plaintiff's experience of pain, fatigue, or other symptoms would periodically be severe enough to interfere with his attention and concentration.  (*Id.*)  Dr. Kauffman also opined that Plaintiff was

15

capable of low-stress work and could "likely perform at least half day work duties that are seated with breaks every half hour to get up and walk around."  (R. at 527.)  Dr. Kauffman also estimated that Plaintiff would be absent from work, on average, two to three times a month as a result of his impairments or treatment.  (R. at 528.)  In Dr. Kauffman's best medical opinion, these symptoms and limitations had been present since August 2008.  (*Id.*)

One month later, Dr. Kauffman prepared a narrative report in which he noted that Plaintiff had received cortisone and visco injections, oral medications, and gels that provided some temporary relief.  (R. at 530.)  Dr. Kauffman further opined that Plaintiff was "disabled to some extent because of his inability to do seated duties for long period[s] of time and because of his inability to stand for long periods."  (*Id.*)  He did, however, acknowledge that Plaintiff "only had a limited set of non-operative treatment and had not undergone any extensive physical therapy or any surgical procedure such as a knee arthroscopy."  (*Id.*)  Dr. Kauffman added that "[w]ithout being able to see the extent of the osteoarthritis and severity of the osteoarthritis as I would normally see with a knee arthroscopy I am a little guarded to say that Joel is fully disabled at this time."  (*Id.*)  Dr. Kauffman also stated that Plaintiff was going to receive a second course of visco injections in the knee and that if these injections failed to provide Plaintiff relief, he would recommend that Plaintiff undergo arthroscopic surgery so that he could better evaluate Plaintiff's condition.  (R. at 530–31.)

On July 23, 2009, Dr. Kauffman's progress notes indicated that Plaintiff was doing 40% better after Hyalgan injections.  (R. at 536.)  On September 24, 2009, Plaintiff told Dr. Kauffman and Physician Assistant Scott Cryder that he had experienced some improvement in his pain.  (R. at 558.)  Upon examination, both found a full range of motion in Plaintiff's lumbar spine, minimal tenderness in his paralumbar spine, limited motion in his left knee with effusion, pain

with palpation of his left knee, and crepitus with range of motion in his left knee.  (R. at 558.)

Dr. Kauffman wrote that because Plaintiff was proceeding well with pain control using ibuprofen

and Voltaren gel, those medications would be continued and he would be allowed to continue his

activities as tolerated.  (R. at 559.)

Dr. Kauffman provided an updated Lower Extremities Impairment Questionnaire on

April 28, 2010.  Dr. Kauffman diagnosed Plaintiff with degenerative arthritis in both knees and

osteochondral exostosis in the left femur. (R. at 581–82.)  Dr. Kauffman also noted that

Plaintiff's pain had improved since receiving Synvisc injections, such that it was moderate and

intermittent at that time.  (R. at 583.)  It could, however, interfere with Plaintiff's ability to

effectively sustain ambulation for more than short periods and distances and impact his ability to

complete activities, depending upon the activity type.  (R. at 583–84.)  Dr. Kauffman opined that

Plaintiff could carry out activities of daily living, but was limited to sitting for four hours and

standing or walking for one hour in an eight-hour day.  (R. at 581–88.)  Dr. Kauffman further

opined that every 45 minutes to an hour, Plaintiff would need to get up and move around for 15

minutes.  (R. at 584, 587.)  Plaintiff could occasionally lift up to 20 pounds, but could never lift

more than that. (R. at 585.)  Dr. Kauffman opined that Plaintiff's pain, fatigue, or other

symptoms would frequently interfere with his ability to concentrate.  (R. at 586.)  He opined that

because Plaintiff's increasing pain was becoming more constant, Plaintiff was incapable of even

low-stress work.  (*Id.*)  Dr. Kauffman stated that in his best medical opinion, these symptoms and

limitations began August 26, 2008.  (R. at 587.)

In May 2010, Plaintiff reported he was still in a lot of pain in his joints and lower spine

and that his children were now doing his vacuuming, cooking, laundry, and cleaning the bathtub.

(R. at 606.)  In July 2010, Plaintiff reported that his pain was worse lately and that he had "really

reduced activities" to avoid provoking pain.  (R. at 605.)  In September 2010, Plaintiff reported that his pain was a lot worse with the cooler weather, and that he could hardly sleep at night due to joint pain.  The muscles in his back hurt if he did not take Valium.  (R. at 604.)

Plaintiff received Synvisc injections to his left knee in October 2010.  (R. at 620–22.)  At the time of the first injection, Physician Assistant Scott Cryder wrote that Plaintiff noticed a good amount of relief after he received Synvisc injections in March 2010, but that the effect of those injections had started to wear off over the last three to four weeks.  (R. at 620.)  Plaintiff related having little to no other difficulties.  (*Id.*)  A week after the first injection, Plaintiff told Scott Cryder that he was "doing okay with some minimal improvements to his left knee."  (R. at 621.)  A week after the second injection, Plaintiff told Scott Cryder that he was "doing quite well with some minimal improvements to his left knee."  (R. at 622.)

On November 18, 2010, Plaintiff told Dr. Kauffman that he was doing a "little better" after receiving his third Synvisc injection.  (R. at 623.)  Dr. Kauffman noted that Dr. Neff had recommended that Plaintiff use a cane and that Plaintiff found using the cane beneficial.  (*Id.*)  Dr. Kauffman opined that Plaintiff was progressing well.  (R. at 624.)  Dr. Kauffman recommended that Plaintiff increase his activities as tolerated and ordered an updated X-ray of Plaintiff's left knee.  (R. at 624.)  That X-ray revealed tricompartmental degenerative changes, most pronounced in the medial joint compartment, and stable osteochondroma arising from the lateral distal femur.  (R. at 625.)

In October 2011, Dr. Kauffman prepared a narrative statement.  (R. at 663–64.)  Dr. Kauffman related that he had treated Plaintiff since August 2008, and an MRI taken around that time confirmed that he had osteoarthritis in the left knee.  (R. at 663.)  Dr. Kauffman also noted that since that initial evaluation until the end of 2009, Plaintiff had progressive arthritis in his

knees that had been managed non-surgically through various types of injections, anti-inflammatories, and activity modifications. (*Id.*) He opined that "there was a definite degree of disability on [Plaintiff's] part." (*Id.*) He further wrote that: "X-rays taken in November of 2010 had confirmed significant narrowing of [Plaintiff's] medial joint line consistent with more progressive severe arthritis in his knee." (*Id.*) Dr. Kauffman concluded that Plaintiff was partially disabled in his left knee because of the osteoarthritis and pain and would have a very difficult time maintaining a full-time job because the arthritis would make it difficult maintain seated or perform standing jobs for long periods of time. (*Id.*)

### 3. Reviewing Physician, Gerald Klyop, M.D.

In December 2008, state-agency physician Dr. Klyop reviewed the record and assessed Plaintiff's physical functioning capacity. (R. at 414–21.) Dr. Klyop opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk up to 6 hours in a workday, sit for about six hours in a workday, and that his ability to push and pull was unlimited. (R. at 415.) According to Dr. Klyop, Plaintiff had no other limitations. (R. at 416–18.) Dr. Klyop stated that Plaintiff's symptoms were partially credible. (R. at 419.)

### 4. Reviewing Physician, Myung Cho, M.D.

Plaintiff's record was reviewed again in March 2009, by state-agency physician, Dr. Cho. (R. at 471–78.) Dr. Cho adopted the ALJ's June 11, 2008 RFC finding under Acquiescence Ruling 98-4. (R. at 472.) Dr. Cho also found that Plaintiff was limited to never crawling or climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and climbing ramps and stairs; and that he was to avoid concentrated exposure to hazards such as machinery and heights. (R. at 473.)

**B.**     **Mental Impairments**

      **1.**     **Tri-County Mental Health and Counseling Services, Inc.**

Plaintiff received mental health services at Tri-County Mental Health ("Tri-County") for

anxiety and depression beginning in 2006.  At issue are records of treatment rendered after the

first determination by ALJ Fina on June 11, 2008.

      **a.**     **Treating Psychiatrist, William Resch, D.O., and Treating Therapist,**
                  **Moira E. Odea, LPCC**

Shortly after the first determination, Plaintiff's treating psychiatrist, Dr. Resch, prepared

a narrative statement.  (R. at 345.)  In that July 28, 2008 narrative, Dr. Resch stated that he was

disappointed that Plaintiff's initial application had been denied because, in his medical opinion,

Plaintiff was disabled from a combination of mental and physical disorders.  (*Id.*)  He identified

Plaintiff's diagnoses as major depressive disorder and anxiety not otherwise specified.  (*Id.*)

According to Dr. Resch, Plaintiff:

> struggles every hour of the day to maintain his basic needs.  If he does have a
> good hour or so of activity he ends up paying for it three to four fold recovering
> from generalized myalgias, arthralgias, and fatigue.  I do not feel he is capable of
> working in any capacity or would be able to maintain gainful employment.

(*Id.*)  Dr. Resch also reported that Plaintiff was very compliant with treatment and evidenced no

malingering or secondary gain.  (R. at 345.)  Dr. Resch expressed his opinion that Plaintiff's

appeal of the first determination by ALJ Fina should be "looked at closely" and that the denial of

benefits to Plaintiff overturned.  (*Id.*)

Also on July 28, 2008, Plaintiff's counselor, Moira O'Dea, LPCC, prepared a narrative

statement.  (R. at 346–47.)  Ms. O'Dea indicated that she had read ALJ Fina's June 11, 2008

determination and asked that Plaintiff's case be carefully reviewed.  (*Id.*)  Ms. O'Dea explained

that Plaintiff experienced marked difficulties in maintaining social functioning and that any

previous treatment notes describing him as doing "well," simply referred to his ability to perform light activities around his home. (R. at 346.) Ms. O'Dea also reported that Plaintiff's attempts to walk regularly despite his severe pain were his way of trying to prevent himself from becoming totally crippled. (*Id.*) Ms. O'Dea noted that Plaintiff attended church less and less because the prolonged sitting caused him pain and that pain caused him to be unable to focus. (*Id.*) She also noted that his attendance at family gatherings did not constitute evidence of social functioning given that his attendance at such functions was difficult and done only out of concern for others. (*Id.*) Ms. O'Dea opined that Plaintiff's "mental health has significantly decreased since 2004 and most especially in the last eight months." (R. at 347.) She noted that Plaintiff exhibited marked difficulties maintaining concentration, persistence, or pace as he could only complete tasks over many days and had often been prevented from completing tasks by anxiety. (*Id.*) She also noted that Plaintiff had increasingly isolated himself and lost interests in outside activities. (*Id.*)

In Dr. Resch's August 28, 2008 mental status assessment, he indicates that Plaintiff had a depressed mood, a frustrated affect, decreased focus and concentration, and loss of short-term memory. (R. at 350–51.) Plaintiff told Dr. Resch that he was depressed, nervous, and frustrated about the social security appeal process, and that he believed that his appeal paperwork had been lost. (*Id.*) Plaintiff reported crying spells, irritability, anhedonia, intense worry, anger, and a longing for female companionship. (*Id.*) Plaintiff also spoke about filing for bankruptcy. (*Id.*) Dr. Resch refilled Plaintiff's prescriptions for buspirone, diazepam, and remeron. (*Id.*)

On October 16, 2008, Dr. Resch's noted that Plaintiff had an anxious and depressed mood but an appropriate affect. (R. at 425–26.) Plaintiff told Dr. Resch that he was "pretty good but still fighting [his] anxiety" and that his "anxiety trumps his depression." (*Id.*) Plaintiff also

reported enjoying his physical therapy and talking with a new mental health therapist who had an accent that conjured up pleasant memories. (*Id.*) Dr. Resch noted that Plaintiff still felt his life was worthless but thought that having some money coming in would go a long way. (*Id.*) Plaintiff also reported that his bankruptcy was complete and that he was rebuilding his credit. (*Id.*) Dr. Resch refilled Plaintiff's previous prescriptions. (*Id.*)

On December 11, 2008, Plaintiff's mood was "up and down," but his affect was appropriate. (R. at 423–24.) Plaintiff reported that his mother-in-law had died the previous day and that he was planning to attend the funeral. (*Id.*) His daughter had also dropped out of school. (*Id.*) Despite that, Plaintiff remained friendly and engaged. (*Id.*) Plaintiff spoke about being prescribed new medications by Dr. Neff for blood pressure and heart arrhythmias and stated that during a mental health evaluation by Dr. Mark Miller, he cried several times and struggled with memory recall. (*Id.*) He also mentioned that a trip to the store with a female friend pursuant to her request for his company went well. (*Id.*)

On May 14, 2009, Dr. Resch completed a Psychiatric Impairment Questionnaire. (R. at 505–12.) Dr. Resch reported that he saw Plaintiff once every 8 weeks since January 2007. (*Id.*) Dr. Resch noted he diagnosed Plaintiff with a chronic and moderate major depressive disorder and a generalized anxiety disorder. (R. at 505.) He found Plaintiff's prognosis "fair," noting that from a psychiatric standpoint, Plaintiff has only partially responded to a combination of medications and long-term psychiatric therapy. (*Id.*) Dr. Resch assigned Plaintiff a Global

Assessment of Functioning (GAF) score of 50-60.[2]  Dr. Resch noted that Plaintiff's primary symptoms were pain, anxiety, and depression.  (R. at 507.)

Dr. Resch opined that Plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions; to complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to travel to unfamiliar places or use public transportation. (R. at 508–10.)  Dr. Resch noted that Plaintiff experienced episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from that situation and/or experience an exacerbation of signs and symptoms evidenced by his extremely low tolerance for driving, public settings, crowds, and unfamiliar situations.  (R. at 510.)  He also emphasized that Plaintiff was not a malingerer.  (R. at 511.)  Dr. Resch opined that Plaintiff was incapable of handling even low-stress work.  (*Id.*)  Dr. Resch estimated that Plaintiff would be absent from work, on average, more than three times a month.  (R. at 512.)  Dr. Resch also indicated that in his best medical opinion, these symptoms and limitations applied since January 10, 2007.  (R. at 512.)

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 51-60 is indicative of moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34.

When seen by Dr. Resch on June 17, 2009, Plaintiff reported that after a few weeks of increased Remeron, he had experienced slightly improved mood and sleep.  (R. at 569–70.)  Dr. Resch noted that Plaintiff moved slowly and appeared to be in physical pain and that his affect was dyshphoric.  (*Id.*)

### b.      Treating Psychaitrist, Arthur Thalassinos, M.D.

Plaintiff began treatment with Dr. Thalassinos at Tri-County on September 29, 2009.  (R. at 578–79.)  During his first visit, Plaintiff reported poor sleep but stated that his mood was "pretty good, the medications help."  (R. at 578.)  On November 24, 2009, Dr. Thalassinos noted that Plaintiff had financial stress.  (R. at 576–77.)  He also noted that Plaintiff was "not too bad," was getting by despite his pain, and was visiting his five-month old grandson often.  (*Id.*)  On January 19, 2010, Plaintiff reported that his anxiety worsened around that time of year, but the holidays had gone well despite having no money because he got to see "the kids."  (R. at 574–75.)  He also reported fragmented sleep due to his knee pain.  (*Id.*)  Dr. Thalassinos noted that Plaintiff's mood was good.  (*Id.*)  On March 15, 2010, Plaintiff reported that he was starting to feel better.  (R. at 618–19.)  His mood was depressed, but not severely, because of his social security disability issues.  (*Id.*)

On May 10, 2010, Plaintiff reported being sad following the death of his father.  (R. at 614–15.)  He also reported visiting his grandson and helping his son fix his house.  (*Id.*)  Plaintiff was still bereaved on July 6, 2010.  (R. at 612–13.)  Dr. Thalassinos accordingly noted that Plaintiff was more dysphoric.  (*Id.*)  Plaintiff again reported fragmented sleep attributable to his pain.  (*Id.*)  He also complained that his "life sucks right now" because of "financial problems." (*Id.*)

24

On August 31, 2010, Dr. Thalassino's mental status examination stated that Plaintiff was "stable" and "less depressed."  (R. at 610–11.)  Plaintiff reported that he was "hanging in there" and though he saw his grandchildren, he was not doing much.  (*Id.*)  He also reported memory problems and losing his train of thought easily, but that to him, it was not that bad.  (*Id.*)  On October 26, 2010, Plaintiff stated that he was doing "okay;" he noted he had disturbed sleep due to pain.  (R. at 617.)  Dr. Thalassino noted that Plaintiff appeared less depressed.  (*Id.*)  Plaintiff reported spending time with his grandson.  (*Id.*)

On December 21, 2010, Plaintiff reported an increase in both depression and anxiety with anxiety attacks characterized by a pounding heart, sweating, and an inability to think.  (R. at 632–33.)  Dr. Thalassino noted that Plaintiff appeared more anxious and depressed.  (*Id.*)  On January 25, 2011, Plaintiff reported that he was more depressed and asked to a see a therapist on a more frequent basis.  (R. at 630–31.)

### 2.      Examining Physician, Marc Miller, Ph.D.

On November 6, 2008, Dr. Miller examined Plaintiff on behalf of the state agency.  (R. at 392–95.)  Plaintiff told Dr. Miller that he had worked for 30 years and that during his tenure, he had only missed eight days of work.  (R. at 392.)  He also suggested to Dr. Miller that he has difficulty with chronic anxiety and depression that had worsened in the two years prior to the evaluation.  (R. at 392.)  Plaintiff reported to that he ate three meals a day, maintained a driver's license but stayed at home aside from going to the library once or twice a week, prepared meals, did laundry, cleaned, went grocery shopping, and managed finances.  (R. at 394.)  Plaintiff also reported that he had a good relationship with his father and his children and had positive interaction with his four siblings.  (R. at 392–94.)

Dr. Miller noted that Plaintiff was credible, cooperative, mannerly, alert, and oriented. (R. at 393–94.)  He further noted that Plaintiff was talkative, had intelligible and understandable speech, engaged in goal-directed conversation, and maintained good eye contact during the interview.  (R. at 393.)  Plaintiff also appeared depressed and exhibited crying behavior with tearfulness.  (*Id.*)  Plaintiff reported that he felt overwhelmed; his facial expressions indicated tension, and he exhibited signs of nocturnal teeth grinding.  (*Id.*)  Plaintiff reported passive suicidal thoughts, anhedonia and poor energy, racing thoughts, disturbed sleep, panic attacks, agoraphobia, agitation, irritability, and thoughts focused on the past.  (*Id.*)  Plaintiff exhibited poor memory, poor concentration, and mistrust toward others.  (R. at 394.)  He also had a history of traumatic events, difficulties with stress, poor self-esteem, avoiding others, and poor motivation.

Dr. Miller opined that Plaintiff's cognitive ability to understand, remember, and carry out one-and two-step job instructions was not impaired and that Plaintiff "appear[ed] to be of good intelligence." (R. at 394.)  Dr. Miller found Plaintiff to be moderately limited in his ability to: interact with co-workers, supervisors, and the public; to maintain attention and concentration; and in his persistence in task completion.  (R. at 394–95.)  Dr. Miller opined that Plaintiff was moderately to markedly limited in his ability to deal with stress and work pressures.  (R. at 394.) Dr. Miller based his assessment on Plaintiff's mental status and not his medical conditions.  (*Id.*) Dr. Miller diagnosed Plaintiff with a chronic pain disorder; a moderate to severe dysthymic disorder; panic disorder with agoraphobia; and a moderate to severe generalized anxiety disorder.  (R. at 395.)  He assigned Plaintiff a GAF score of 55.  (*Id.*)

### 3. Reviewing Physicians, Irma Johnston, Psy.D./Kevin Edwards, Ph.D.

On November 12, 2008, state-agency psychologist Irma Johnson reviewed Plaintiff's medical records and assessed his mental condition.  (R. at 396–413.)  Dr. Johnston found that Plaintiff had mild restrictions in activities of daily living and moderate difficulties maintaining social functioning, maintaining concentration, persistence or pace, but he alsoexperienced no episodes of decompensation.  (R. at 406.)  Dr. Johnston also found that the evidence did not establish the presence of the "Part C" criteria.  (R. at 407.)  In a narrative assessment of Plaintiff's ability to engage in work-related activities from a mental standpoint, Dr. Johnston concluded that Plaintiff possessed some limitations but retained significant functional capacity. (R. at 412.)  Dr. Johnson opined that Plaintiff was able to understand and follow simple instructions but that his anxiety and depression moderately impaired his concentration, attention, social interactions, adaptability, and his ability tolerate stress. (*Id.*)  He opined that Plaintiff would consequently work best in a static environment with simple, repetitive tasks and limited interpersonal relating.  (R. at 412.)

On March 10, 2009, Kevin Edwards, Ph.D., reviewed Plaintiff's record upon reconsideration and noted that the treatment records did not support Plaintiff's allegations of a worsening of his mental impairments.  (R. at 470.)  According to Dr. Edwards, the medical evidence showed that Plaintiff's treatment was helpful at the same time that he was dealing with a death in the family and his daughter dropping out of school.  (*Id.*)  Dr. Edwards affirmed Dr. Johnston's assessment.  (*Id.*)

### IV. THE ADMINISTRATIVE DECISION

On July 12, 2011, ALJ Eppler issued a partially favorable decision.  ALJ Eppler found that the medial assessments done after ALJ Fina's first determination on June 11, 2008,

established that Plaintiff had the following additional severe impairment: osteoarthritis of the left knee, hypertension, pain disorder, and affective and anxiety related disorders.[1] (R. at 25.) ALJ Eppler concluded that the record did not establish that these impairments caused Plaintiff's mental condition to deteriorate. (R. at 27.) She further concluded that these additional impairments did cause Plaintiff's physical condition to deteriorate on April 1, 2010. (R. at 28.) ALJ Eppler accordingly adopted ALJ Fina's RFC determination for the period of June 12, 2008, until March 31, 2010. (*Id.*) Specifically, ALJ Eppler found that during this period, Plaintiff retained the residual functional capacity to:

> perform light work, as defined in C.F.R. §§ 404.1567(b) and 416.967(b), subject to the following: (1) no crawling or climbing of ladders, ropes or scaffolds; (2) no more than occasional balancing, stooping, crouching, kneeling or climbing of ramps or stairs; and (3) no concentrated exposure to unprotected heights; (4) From a mental standpoint, he was limited to simple, routine and repetitive tasks in a low stress job (which in this case is defined as no strict production quotas or significant time pressures) and requires no more than occasional decision making.

(R. at 27, 111.)[2] ALJ Eppler further adopted ALJ Fina's determination that although Plaintiff could not perform his past relevant work during this period, he could still perform jobs that existed in significant numbers in the national economy from June 12, 2008, until March 31, 2010. (R. at 30.) ALJ Eppler explained as follows:

---

[1] In the first determination, ALJ Fina found that Plaintiff had the following severe impairments: fibromyalgia; degenerative disc disease of the spine at the cervical, thoracic and lumbar levels; major depressive disorder, and anxiety. (R. at 109.)

[2] ALJ Eppler's residual functional capacity determination for June 12, 2008, until March 31, 2010 includes the same limitations as ALJ Fina's determination except that ALJ Eppler's definition of a low-stress job additionally includes no strict production quotas or significant time pressures. (R. at 27, 111.)

> As summarized in the June 2008 ALJ decision, the Administrative Law Judge asked Michelle Peters, an impartial vocational expert, whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. Ms. Peters testified that given all of these factors the individual would have been able to perform the requirements of representative occupations in the central Ohio primary metropolitan statistical area, including as an assembler (750 "unskilled" "light" exertional jobs); packager (850 "unskilled" "light" exertional jobs); and sorter (800 "unskilled" "light" exertional jobs).

(*Id.*) (internal record citations omitted.)

On the other hand, ALJ Eppler determined that as of April 1, 2010, Plaintiff could no longer do light work with restrictions, but instead could only perform sedentary work as defined in 20 C.F.R. §§404.1567(a) and 416.97(a), subject to the same mental functional capacity restrictions as before: simple, routine and repetitive tasks in a low-stress job, with no strict production quotas, significant time pressures, or frequent decision making. (R. at 29). ALJ Eppler nevertheless determined that Plaintiff had already reached 50 years of age before April 1, 2010, and that regulations mandate that persons over 50 years of age who can only perform unskilled sedentary work are to be determined disabled. (R. at 30–31.) Accordingly, based on Plaintiff's age, education, and work experience, ALJ Eppler found that Plaintiff became disabled as of April 1, 2010, and has continued to be disabled for purposes of supplemental security income since that date. (R. at 30–31.) After reviewing the evidence, ALJ Eppler also concluded that Plaintiff's statements about the intensity, persistence, and limiting effects of his impairments were not credible prior to April 1, 2010 because the objective medical evidence did not document a significant change in Plaintiff's condition until that date. (R. at 28–29.) She further concluded that Plaintiff was not under a disability within the meaning of the Social Security Act at any time through December 31, 2009, the date last insured for purposes of disability insurance benefits. (R. at 30.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

30

# VI. LEGAL ANALYSIS

In his Statement of Errors, Plaintiff asserts that ALJ Eppler improperly relied upon the ruling in *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), to adopt ALJ Fina's determination of non-disability for the period of June 12, 2008, until Plaintiff became disabled on April 1, 2010. Specifically, Plaintiff submits that his treating physicians, Drs. Resch, Neff, and Kauffman, offered new and material evidence that he was disabled during this period and that ALJ Eppler should have given those opinions controlling weight or better explained what weight she assigned to those opinions and the reasons for the assignments. (Pl's Statement of Errors 12, ECF No. 8.) Plaintiff also asserts that the ALJ failed to properly evaluate his credibility. (*Id.* at 17.) Finally, Plaintiff argues that the ALJ relied upon flawed VE testimony. (*Id.* at 19.) The Court will address each of these assignments of errors in turn.

## A.      The ALJ Properly Relied Upon the Principles in *Drummond*

In his Statement of Errors, Plaintiff contends that ALJ Eppler erred in concluding that she was bound by ALJ Fina's prior RFC determination. Plaintiff argues that that the record contains new and material evidence in the form of detailed opinions from Plaintiff's treating physicians, Drs. Resch, Neff, and Kauffman, demonstrating changed circumstances. The Court disagrees.

In *Drummond*, the United States Court of Appeals for the Sixth Circuit held that principles of *res judicata* apply to both claimants and the Commissioner in Social Security cases. 126 F.3d at 841–42. The *Drummond* Court specifically held that absent evidence of "changed circumstances" relating to a claimant's condition, "a subsequent ALJ is bound by the findings of a previous ALJ." *Id.* at 842. Accordingly, the Sixth Circuit reasoned that when an ALJ seeks to deviate from a prior ALJ's decision, "[t]he burden is on the Commissioner to prove changed circumstances and therefore escape the principles of *res judicata*." *Id.* at 843. Applying this

31

approach, the *Drummond* Court concluded that an ALJ was bound by a previous ALJ's determination that the claimant retained the RFC to perform sedentary work because evidence did not indicate that the claimant's condition had improved.  *Id.* at 843.

Following *Drummond*, both the Sixth Circuit and this Court have indicated that when a claimant seeks to avoid application of a prior ALJ's finding, he or she must produce evidence demonstrating that his or her condition has worsened since the time of the prior determination. *See, e.g.*, *Caudill v. Comm'r of Soc. Sec.*, 424 F. App'x 510, 515 (6th Cir. 2011) (holding that an ALJ was justified, under *Drummond*, in adopting a previous ALJ's finding that the claimant had a "limited education"  because the claimant "introduced no new or additional evidence with respect to illiteracy versus limited education") (internal quotations omitted); *Holt v. Astrue*, No. 1:10–cv–439, 2011 WL 3861891, at *7 (S.D. Ohio July 6, 2011) ("[B]ecause Plaintiff failed to present any new and/or material evidence in the record that showed Plaintiff's condition had worsened since [the] previous unfavorable decision, [the ALJ] acted properly by following *Drummond* and . . . adopting said decision.") (Report and Recommendation later adopted); *Salsgiver v. Comm'r of Soc. Sec. Admin.*, No. 1:11–CV–351, 2012 WL 2344095, at *12 (N.D. Ohio June 20, 2012) ("It is the claimant's burden to present evidence showing that her symptoms have changed since the time of the Commissioner's prior determination obviating the application of the ruling in *Drummond*.").

Additionally, the Social Security Administration issued an Acquiescence Ruling following *Drummond*.  Specifically, in light of *Drummond*, Social Security Acquiescence Ruling 98–4(6) mandates as follows:

> [W]hen adjudicating a subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as the prior claim, adjudicators must adopt
> such a finding from the final decision by an ALJ or the Appeals Council on the
> prior claim in determining whether the claimant is disabled with respect to the
> unadjudicated period unless there is new and material evidence relating to such a
> finding or there has been a change in the law, regulations or rulings affecting the
> finding or the method for arriving at the finding.

AR 98–4(6), 1998 WL 283902, at *3 (June 1, 1998).  Within the Social Security context, new evidence is evidence that was "not in existence or available to the claimant at the time of the administrative proceeding that may have changed the outcome of the proceeding." *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 Fed. Appx. 637, 647 (6th Cir. 2013) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).  Evidence is considered material if there is a reasonable probability that the Commissioner would have reached a different decision if he or she had considered the new evidence.  *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).

In this case, ALJ Eppler applied *Drummond* and concluded that she was bound by ALJ Fina's RFC determination for the period of June 12, 2008, until Plaintiff became disabled on April 1, 2010.  (R. at 26–29).  ALJ Eppler examined the medical reports developed after the first determination, including those from Plaintiff's treating physicians, and determined that they did not demonstrate that Plaintiff's physical and mental condition deteriorated during this time frame.  Substantial evidence supports that determination.

### 1.  Plaintiff's Physical Impairments

Plaintiff asserts that ALJ Eppler erroneously failed to afford controlling weight to opinions offered by his treating physicians, Drs. Neff and Kauffman.  ALJ Eppler considered their opinions and determined that they did not demonstrate that Plaintiff's physical condition deteriorated prior to April 1, 2010.  Substantial evidence supports that determination.

Specifically, throughout the relevant period of 2008 and 2009, treatment notes from Drs. Neff and Kauffman do not indicate that Plaintiff's physical condition was worsening. Indeed, many of Dr. Neff's treatment notes throughout this time frame indicated that Plaintiff "appeared to be his usual self." (R. 303, 304, 468, 466.) Although Dr. Neff determined on June 30, 2008, that Plaintiff had mild to moderate degenerative arthritis involving both knees, in September 2008, Plaintiff told Dr. Neff that steroid injections administered by Dr. Kauffman made his knees feel better. (R. at 469.) Similarly, in October 2008, Plaintiff told Dr. Kauffman that he was doing home exercises and that his knees were about 50% better. (R. at 456.) After receiving Synvisc injections in December 2008 and January 2009, Plaintiff told Dr. Kauffman on January 22, 2009, that the injections had given him 60% relief. (R. at 469.) At that time, Dr. Kauffman opined that Plaintiff was showing "progressive improvement" with regard to his knee issues. (R. at 540.) In May 2009, Dr. Kauffman also noted that a cortisone shot administered in April 2009 provided Plaintiff with relief after he had experienced increased pain in April. (R. at 539, 540.) In sum, these documents not only fail to indicate a worsening of Plaintiff's condition, they suggest that Plaintiff experienced some improvement with treatment.

Plaintiff points to the questionnaires completed by Drs. Neff and Kauffman in May and June 2009, and argues that ALJ Eppler should have given these opinions controlling weight. (Pl's Statement of Errors 14, 15, ECF No. 8.) In her determination, ALJ Eppler specifically considered these two questionnaires. She concluded as follows:

> In May 2009, [Dr. Neff] indicated that [Plaintiff] was limited to a range of sedentary work and would be unable to sustain full time work activity on a regular basis . . . Similarly, in June 2009, [Dr. Kauffman] assessed a limitation to a substantially reduced range of sedentary work. However, in July 2009, Dr. Kauffman acknowledged that [Plaintiff] had had only a limited set of nonoperative treatment and had not undergone any extensive physical therapy or any surgical procedure . . . Dr. Kauffman concluded that he was "a little guarded to say that [Plaintiff] is fully disabled at this time."

(R. at 28.) ALJ Eppler thus reasoned that the opinions concerning Plaintiff's capacities in these questionnaires were not well-supported by medically acceptable and clinical and laboratory diagnostic techniques. (*Id.*) In such circumstances, an ALJ may decline to give opinions from treating physicians controlling weight, provided that the ALJ provides a reason for doing so. 20 C.F.R §404.1527(d). *Jones v. Comm'r of Soc Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). ALJ Eppler adequately explained her assessment of these questionnaires.

Moreover, ALJ Eppler specifically determined that these documents did not demonstrate that Plaintiff's condition deteriorated. (R. at 29.) Substantial evidence supports this determination. For example, in his May 2009 questionnaire, Dr. Neff indicated that Plaintiff's primary symptoms included generalized muscle and joint pain—not knee pain. (R. at 497.) Also in that document, Dr. Neff noted that cortisone injections were helpful for Plaintiff's knee pain. (R. at 501.) Dr. Neff's questionnaire therefore does not establish that Plaintiff's knee issues had caused his condition to worsen. Moreover, even though Dr. Neff stated: "[m]ost of the patients I follow and treat for fibromyalgia are able to function and work full time . . . . [but Plaintiff's] pain is disabling," he also indicated that in his best medical opinion, the symptoms and limitations contained in the questionnaire were applicable *since 1993*. (R. at 503.) Thus, the opinions set forth in Dr. Neff's May 2009 questionnaire likewise do not establish that Plaintiff's condition deteriorated after the first determination in June 2008, and do not, even if controlling, permit Plaintiff to avoid the preclusive effect of *Drummond*. *See Salsgiver*, 2012 WL 2344095, at *12 (explaining that a plaintiff must present new and material evidence showing that his or her condition deteriorated *after* an ALJ makes a determination).

In addition, ALJ Eppler determined that Plaintiff's treatment records following the questionnaires did not demonstrate deterioration. (R. at 28.) Substantial evidence likewise

supports this determination.  Specifically, the records reflect that for several months after the
questionnaires were prepared, Plaintiff told Drs. Neff and Kaufman and Physician Assistant
Scott Cryder that his knees were better after receiving injections.  (R. at 552, 536, 551, 539.)
Indeed, Plaintiff reported that his knees were 40% better on July 20, 2009, and 50% better on
August 19, 2009.  (R. at 536, 551.)  Consistently, on September 24, 2009, Plaintiff again
informed Dr. Kauffman and Physician Assistant Scott Cryder that he had experienced
improvement with his knee pain.  (R. at 558.)  At that time, Dr. Kauffman opined that Plaintiff
was proceeding well with pain management using ibuprofen and Voltaren gel and recommended
that he increase his activities as tolerated.  (R. at 559.)  On January 27, 2010, Plaintiff also
informed Dr. Neff that he was "hanging in there" and that the injections from Dr. Kauffman
"help[ed] some," even though he had intense pain three or four times a week.  (R. at 609.)

  The Court find that substantial evidence instead supports ALJ Eppler's determination that
the record reflected that Plaintiff's condition had worsened as of April 1, 2010.  ALJ Eppler
reasoned that Drs. Neff and Kauffman's April 2010 questionnaires evidenced a worsening in
Plaintiff's condition as of April 1, 2010.  (R. at 29.)  She also cited records from treatments after
this date demonstrating a change for the worse in Plaintiff's condition, including Plaintiff's
November 2010 prescription from Dr. Neff for a cane and November 2010 x-rays depicting
tricompartmental degenerative changes in Plaintiff's knee.  (*Id.*)  ALJ Eppler correctly noted that
in the updated questionnaires, both doctors included restrictions for sedentary work given the
additional restrictions set forth in the updated documents.  (R. at 29.)  In addition, in his
questionnaire, Dr. Kaufmann indicated that although Plaintiff's pain had improved with
injections, his "increasing pain" was "becoming more constant" and would now frequently
interfere with his ability to concentrate.  (R. at 583, 586.)  Notably, Dr. Kauffman had previously

indicated in his June 2009 questionnaire that Plaintiff's pain would only cause periodic interference with concentration.  (R. at 527.)  Dr. Kauffman also indicated in his April 2010 questionnaire that Plaintiff could now sustain ambulation for short periods and distances only; Dr. Kauffman previously indicated in his June 2009 questionnaire that Plaintiff had no inabilities in this area.  (R. at 524, 583.)

Plaintiff counters that that in his April 2010 questionnaire, Dr. Kauffman opined that the symptoms he identified in that document applied since August 26, 2008.  (Pl's Statement of Errors 15, ECF No. 8.)  Plaintiff contends that ALJ Eppler should have afforded this opinion controlling weight and found that Plaintiff's condition deteriorated in August 2008, or should have explained why Dr. Kauffman's opinion about onset date was not fully credited.  (*Id.*)  The Court finds no reversible error.  Nevertheless, ALJ Eppler explained at length that medical records, including Dr. Kauffman's treatment notes and reports by the state-agency reviewing physicians, did not demonstrate that Plaintiff's physical condition had deteriorated in 2008 and 2009.  (R. at 28.)  ALJ Eppler's discussion illustrates that Dr. Kauffman's notation relating to an August 26, 2008 onset date is inconsistent with other substantial record evidence.  Thus, even though ALJ Eppler did not specifically explain why this particular notation in Dr. Kauffman's questionnaire was not given controlling weight, that failure does not constitute reversible error. *See Nelson v. Comm'r of Soc. Sec.*, No. 05-5879, 2006 WL 2472910, at *7 (6th Cir. Aug. 28, 2006) (explaining that an ALJ may indirectly attack the supportability of a treating physician's opinion by examining and discussing other evidence).

### 2.  Plaintiff's Mental Impairments

Plaintiff next argues that ALJ Eppler erroneously failed to afford controlling weight to opinions contained in Dr. Resch's May 14, 2009 Psychiatric/Psychological Questionnaire.  (Pl's

Statement of Errors 16, ECF No. 8.)  In addition, Plaintiff argues that ALJ Eppler erroneously failed to explain why the opinions in that questionnaire were not controlling.  (*Id.*)  The Court disagrees.

In her determination, ALJ Eppler specifically explained that Dr. Resch's May 2009 questionnaire did not document that Plaintiff's condition had deteriorated and was, therefore, not entitled to significant weight.  ALJ Eppler explained as follows:

> In July 2008, William Resch, D.O. opined that [Plaintiff] was disabled from a combination of mental and physical disorders . . . but at that point, the updated evidence of record did not document a change in Plaintiff's condition since the June 2008 ALJ decision . . . *For these same reasons*, Dr. Resch's May 2009 disabling assessment . . . is also not entitled to controlling weight.

(R. at 28 (emphasis added).)  Substantial evidence supports this conclusion.  In the May 2009 questionnaire, Dr. Resch wrote that that the symptoms and limitations in that document applied since January 10, 2007.  (R. at 512.)  That document does not purport to reflect changes since the first determination, and thus cannot be used to show a worsening in Plaintiff's condition.

ALJ Eppler also explained that other record evidence did not reflect that Plaintiff's condition had deteriorated.  To begin, ALJ Eppler explained that the report from evaluating physician Dr. Miller on November 6, 2008, indicated that Plaintiff would have a moderately impaired ability to relate to others and a moderate to markedly impaired ability to deal with work stress or pressure.  (R. at 27.)  She similarly noted that in November 2008, reviewing physician Dr. Johnson indicated that Plaintiff was moderately limited in social functioning.  (*Id.*)  ALJ Eppler, however, determined that Plaintiff's social functioning was only mildly limited.  (*Id.*)  She also determined that Plaintiff only had moderate limitations as to concentration, pace, and persistence.  (*Id.*)  In reaching this conclusion, she correctly noted that Dr. Miller's report indicated that Plaintiff:

> was early for his appointment, average in appearance and grooming, reliable, credible, cooperative, mannerly, aware, talkative, alert, and fully oriented. [Plaintiff] maintained good eye contact and intelligible, understandable fluent speech with goal directed conversation. [Plaintiff] reported. . . that he does not nap during the day and eats three meals a day, maintains a driver's license, goes to the library once or twice a week, prepares meals, does laundry, cleans, grocery shops, and manages finances. [Plaintiff also] reported a good relationship with his father and his children and his siblings.

(*Id.*) Further, she noted that in his March 2009 report, reviewing physician Dr. Edwards opined that treatment notes did not indicate that Plaintiff's mental condition had deteriorated. (*Id.*) ALJ Eppler therefore determined that pursuant to the principles in *Drummond*, the findings in the first determination would not be disturbed. (*Id.*)

Substantial evidence supports this determination. The July 2008 letter from Dr. Resch and Therapist O'Dea did not indicate that Plaintiff's condition deteriorated after the first determination. (R. at 345, 346–47.) Instead, both letters expressed dissatisfaction with how ALJ Fina had ruled in the first determination and urged the Appeals Council to closely examine Plaintiff's appeal in that case. (*Id.*) In addition, treatment records after July 2008 do not document detrimental changes to Plaintiff's mental condition. The records reflect that Plaintiff's treatment was related to his depression and anxiety disorder. (R. at 350–51, 425–26, 507, 632–33, 630–31.) ALJ Fina considered Plaintiff's depression and anxiety disorder. (R. at 114.) Plaintiff's treating physician, Dr. Neff, noted that Plaintiff's experienced anxiety issues since at least 1993. (R. at 503, 601.)

Moreover, the mental health treatment records also generally indicate that Plaintiff's condition was not worsening. In October and December of 2008, Dr. Resch noted that although Plaintiff's mood was anxious and depressed and "up and down," his affect was appropriate. (R. at 425–26, 423–24.) In December, Dr. Resch noted that Plaintiff remained friendly and engaged even though his mother-in-law had passed away and his daughter had dropped out of school. (R.

at 423–24.)  Dr. Resch also noted that Plaintiff reported improved mood and sleep after his

Remeron was increased in June 2009.  (R. at 569–70.)  Similarly, in September 2009, Plaintiff

told Dr. Thalassinos that his mood was "pretty good" and that "medications help" and that he

was "not too bad" in November 2009.  (R. at 578, 576–77.)  Plaintiff also told Dr. Thalassinos in

January 2010 that he fared well over the holidays even though his anxiety typically worsened at

that time of the year.  (R. at 574–75.)  Plaintiff also noted at various points throughout this period

that he spent time with his kids and his grandson.  (R. at 574–75, 576–77, 614–15, 617.)  He also

went on an outing with a female friend.  (R. at 423–24.)

        In sum, substantial evidence supports ALJ Eppler's conclusion that the record did not

reflect deterioration of Plaintiff's mental impairments after the first determination.

Consequently, ALJ Eppler did not commit reversible error when, pursuant to *Drummond*, she

adopted the findings related to Plaintiff's mental condition set forth in the first determination.

**B.      The ALJ Properly Assessed Plaintiff's Credibility**

        Next, Plaintiff asserts that ALJ Eppler erred in assessing his credibility.  Specifically, he

posits that ALJ Eppler erroneously failed to explain why Plaintiff's testimony was not credible.

(Pl's Statement of Errors 17–18, ECF No. 8.)  He also objects to ALJ Eppeler's use of a

"template" or boilerplate language.  (*Id.*)

        "[The] ALJ's assessment of credibility is entitled to great weight and deference, since he

[or she] had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue*, 263 F.

App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th

Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining

to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew,

resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).  This

deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific, the intent behind this standard is to ensure meaningful appellate review.") (citation omitted).

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).

Here, the Court declines to disturb ALJ Eppler's credibility determination. ALJ Eppler specifically stated that after considering the evidence, Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible prior to April 1, 2010, to the extent they are inconsistent with the residual capacity assessment" adopted from the first determination pursuant to *Drummond*. (R. at 28.) ALJ Eppler then proceeded to explain how the record evidence failed to show that Plaintiff's condition deteriorated until April 1, 2010. (R at 28–29.) In that explanation, she summarized information in treatment records, including records from Plaintiff's treating physicians, Drs. Resch, Neff, and Kauffman, his Treating therapist O'Dea, and reviewing physicians Klyop and Cho. (R. at 28.) She then concluded that "the summarized evidence does not document a significant change in Plaintiff's physical or mental condition since the June 2008 ALJ decision for the period prior to April 1, 2010." (R. at 29.) As explained previously, substantial evidence supports that determination.

Plaintiff additionally complains that ALJ Eppler's explanation improperly used a template or boilerplate language in her credibility determination. (Pl's Statement of Errors 18, ECF No. 8.) In this instance, however, ALJ Eppler's credibility determination was based upon more than mere boilerplate assertions. Indeed, her discussion of how the evidence failed to show that Plaintiff's condition deteriorated evinces a meaningful examination of the facts in the record. For these reasons, the ALJ did not commit reversible error when assessing Plaintiff's credibility.

**C.** **The ALJ Properly Relied Upon Testimony from the VE in the First Determination**

Finally, Plaintiff asserts that ALJ Eppler erroneously relied upon flawed vocational expert testimony. (Pl's Statement of Errors 19, ECF No. 8.) In support of this assertion, Plaintiff cites testimony from the May 19, 2011 hearing and submits that the hypothetical posed by ALJ Eppler to VE Lynn Kaufman did not accurately describe Plaintiff's limitations. (*Id.*)

The Court finds Plaintiff's final contention to be without merit.  ALJ Eppler did not rely upon VE testimony elicited from Ms. Kaufman at the May 2011 hearing.  Rather, ALJ Eppler determined that because Plaintiff's condition did not deteriorate until April 1, 2010, she was bound by the findings in the first determination until that date, including the RFC adopted by ALJ Fina and ALJ Fina's determination that jobs existed in the economy that Plaintiff could perform with that RFC.  (R. at 29–30.)  This was a proper application of *Drummond*.

## VII.  DISPOSITION

For the reasons set forth herein, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.


**IT IS SO ORDERED.**

Date: <u>March 21, 2014            </u>          <u>/s/ *Elizabeth A. Preston Deavers*</u>
                                                Elizabeth A. Preston Deavers
                                                United States Magistrate Judge